# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

JASON HAYES PARKER,

                Defendant.

_____/

CASE NO. 6:11-cr-0005-MJS

ORDER DENYING DEFENDANT'S FED. R. CRIM. P. 29 MOTION FOR ACQUITTAL AND AFFIRMING BENCH RULINGS DENYING MOTIONS TO DISMISS AND SUPPRESS

(ECF Nos. 8, 32, 40)

## I.   INTRODUCTION

The following recaps and reaffirms the Court's rulings on Defendant Jason Parker's ("Defendant's") motions to suppress and to dismiss and constitutes its statement of decision on Defendant's motion for acquittal.

## II.   PROCEDURAL HISTORY

On August 23, 2011, a criminal Complaint was filed in this Court charging Defendant with the five misdemeanor counts enumerated below:

Count 1:     Possession of a concealed weapon, in violation of California Penal Code section 12025 (a)(1)(6)(A)(B) as assimilated pursuant to 18 U.S.C. § 13;

Count 2:     Possession of controlled substance Marijuana (less than 1 oz.) in violation of 36 C.F.R. § 4.35(b)(2);

Count 3:     Driving on a suspended license in violation of 36 C.F.R. § 4.2(b) incorporating California Vehicle Code section 14601.1(a);

| 1 | Count 4: | Expired vehicle registration in violation of 36 C.F.R § 4.2(b) |
| 2 | | incorporating California Vehicle Code section 4000(a); |
| 3 | Count 5: | Obstructing traffic in violation of 36 C.F.R. § 4.13 |

On September 2, 2011, Defendant filed a motion to suppress physical evidence and statements. (Def.'s Mot. to Suppress, ECF No. 4.) Opposition was filed. (Pl.'s Opp. to Mot. to Suppress, ECF No. 7.) On September 21, 2011, an evidentiary hearing was held, and the motion to suppress was denied. (ECF No. 8.)

Jury trial was scheduled to commence on August 31, 2012. (ECF No. 24.) Defendant moved to dismiss Counts 1 and 2 of the Complaint. (Def.'s Mot. to Dismiss Certain Counts, ECF No. 28.) On August 21, 2012, the government filed a First Amended Complaint. (Am. Compl., ECF No. 29.) The First Amended Complaint charged Defendant with:

| Count 1: | Possession of a concealed weapon, in violation of 35 C.F.R. § 2.4(f); |
| Count 2: | Driving on a suspended license in violation of 36 C.F.R. § 4.2 (b) incorporating California Vehicle Code section 14601.1(a); |
| Count 3: | Having an expired vehicle registration in violation of 36 C.F.R. § 4.2(b) incorporating California Vehicle Code section 4000(a); and |
| Count 4: | Obstructing traffic in violation of 36 C.F.R. § 4.13. (Id.) |

Inasmuch as the First Amended Complaint did not include the previously charged Class A misdemeanor violation (California Penal Code section 12025(a)(1)(6)) and the remaining charges were all Class B misdemeanors, no right to jury trial remained. Accordingly, on September 6, 2012, trial commenced after the Court, on that date, tentatively denied Defendant's then still-pending motion to dismiss Count 1 charging possession of a concealed weapon. The United States presented evidence on the four counts in the First Amended Complaint. Defendant moved for judgment of acquittal in accordance with Fed. R. Crim. P. 29. Post trial briefing was submitted in support of and in opposition to Defendant's said motion. The matter is now deemed submitted.

///

III.   **FACTS**

The following facts, compiled from the exhibits admitted into evidence at the suppression hearing and at trial, as well as the testimony and stipulations presented at or in connection with each proceeding, are believed to be undisputed:

On the afternoon of August 20, 2011, Yosemite National Park Law Enforcement Ranger David Pope was dispatched to investigate reported traffic congestion near Curry Village, a facility providing visitor amenities in Yosemite Valley in Yosemite National Park. On arrival at a large parking area (commonly referred to as the Curry Village Orchard Lot), Ranger Pope observed a Chevrolet pick-up truck parked in a paved drive used for travel within and around the parking lot. (Generally, cars looking for a parking space at that location circle rows of cars parked side-by-side and essentially perpendicular to the two lanes of travel used by those looking for parking.) The Chevrolet pick-up was parked in one of the two lanes of travel and at the end of and perpendicular to a row of parked cars. It was unoccupied. It contained assorted camping-type gear in and behind the front seat of the cab and in the pick-up bed. Also in the pick-up bed was a cooler such as is used for food storage.

According to Ranger Pope, the parked truck constricted the two-lane roadway to one lane and interfered with the flow of traffic, which was heavy, in the parking lot. Ranger Pope commenced writing a parking violation citation when he was approached by a male, subsequently identified as Defendant. According to Ranger Pope, Defendant identified himself as the owner of the truck, said he had stopped only temporarily to inquire about possible camping accommodations, and proposed to move the vehicle to a more appropriate parking spot. Ranger Pope requested and was given Defendant's California Department of Motor Vehicles identification. Ranger Pope then noticed that the registration sticker on the vehicle's license plate had expired. His radio check with dispatch reportedly confirmed that the pick-up's registration had expired. Ranger Pope requested that additional rangers come to the scene. He was joined by Law Enforcement Rangers Scott Bicknese and Scott Jacobs. Defendant's passenger, whom defendant referred to as his

girlfriend, also arrived at the scene.

Defendant advised that he believed he had registration documentation in the vehicle, and it would show the vehicle was in fact then registered. Ranger Jacobs asked to see it. Defendant offered to retrieve it but, according to Jacobs, invited Ranger Jacobs not to accompany him. (Ranger Pope also recalled Defendant indicating that he would rather get a ticket than have Ranger Pope get the registration.) Ranger Jacobs did accompany him. While Ranger Pope remained with the girlfriend who was sitting on the back bumper of the truck, Ranger Jacobs followed directly behind Defendant to the driver's side door of the truck. According to Ranger Jacobs, when the door was opened, he immediately smelled the distinct and very strong odor of green marijuana emanating from the inside of the passenger compartment. Ranger Jacobs also testified that before going to the glove box where he said the registration was located, Defendant first began "rummaging" in the center console area. The two then crossed in front of the car and moved towards the passenger door.

Ranger Jacobs asked Defendant how much marijuana he had. Defendant said he had none. Ranger Jacobs advised he had smelled it. Defendant claimed to "have a personal use of marijuana in the car."[1] Defendant also was asked if he had any weapons in the car. He initially replied that he did not.

Reportedly because of the odor of marijuana coming from the cab, Ranger Bicknese was directed to and did initiate a search of the vehicle. As the search began, Defendant indicated that there was in fact marijuana in the vehicle and after again indicating he had no weapons, said he "may have a handgun in the car." Defendant was patted down and he and his girlfriend directed to sit by a tree away from the vehicle and in the company of one or more of the rangers.

On beginning his search of the cab of the vehicle, Ranger Bicknese detected the

---

[1] This is a quote from the transcript of the suppression hearing. It is unclear if this comment was intended or understood to refer to marijuana being present in the cab or Defendant having a medical marijuana card in the vehicle.

1  "overwhelming" and "smokey" smell of recently smoked marijuana.

2  The search produced a closed glass jar (labeled "California Medical Cannabis

3  Patient Co-op") reportedly containing approximately 7 grams of marijuana. The jar was

4  found in a plastic shopping bag sitting on the back of the center console. Defendant said

5  the marijuana was his. Ranger Pope testified that after the jar was located but while it was

6  still closed and in the vehicle, he could smell a strong odor of marijuana while standing at

7  the open door of the truck. (He did not describe the odor as either that of raw, unsmoked

8  or smoked marijuana.)

9  Also, in the map pocket behind the driver's seat of the pick-up, under blankets and

10  sleeping bags and hidden from view, was a holstered, unloaded, Makarov, caliber 9x18,

11  semi-automatic pistol and a loaded magazine (not in the pistol). Defendant acknowledged

12  the pistol was his, a gift his father had given him approximately three weeks earlier.

13  Defendant was arrested and charged as aforesaid.

14  **IV.**   **MOTION TO SUPPRESS**

15       **A.**   **Procedural History; Issues**

16  As noted, on September 2, 2011, Defendant filed a motion to suppress evidence

17  seized at the scene of the arrest on the grounds that the vehicle was searched without a

18  warrant, without Defendant's consent and without probable cause to suspect it contained

19  contraband. Defendant also argued that statements made at the scene should be

20  suppressed because they were made in response to custodial interrogation without his

21  having been advised of his Miranda rights.

22  However, at the hearing, the defense agreed, first, that the rangers did have

23  reasonable suspicion based upon the expired registration tag on the license plate to briefly

24  detain and question Defendant about the validity of the registration. Second, the defense

25  agreed that the crucial issue on the motion to suppress was whether the officers'

26  statements that they could smell marijuana were credible thereby giving them probable

27  cause to search the vehicle for evidence that the crime of possessing marijuana in the

28  National Park was being committed. The defense acknowledged that if the officers did

detect the odor of marijuana in the car, it would not have been inappropriate for them to have searched the car.

The issues were briefed and the evidentiary hearing held on September 11, 2011. At the conclusion of the hearing the Court denied the motion to suppress for reasons stated on the record.

However, at trial, defense counsel asked the Court to consider whether the evidence presented at trial justified reconsideration of the ruling on the motion to suppress. The Court has carefully reviewed the additional evidence presented at trial and applicable law and, for the reasons below, concludes that the motion was correctly denied.

**B.    Credibility Dispute**

The defense focuses its challenge to the evidence on the argument that the rangers' claimed detection of the aroma of marijuana coming from Defendant's vehicle was and is not credible.

In this regard, evidence was presented, and unrefuted, that there were other odors in the air at the scene including the smell of commercial food cooking nearby and possibly campfires. More significantly, Defendant testified that just prior to his contact with law enforcement, he and his girlfriend had been traveling in the cab of the truck for about two hours during which time she smoked approximately ten cigarettes and he smoked one to two grape flavored cigars. He sated that the cab smelled like smoke as "it always does." The defense also noted the conflict between the two officers as to whether the odor detected was that of smoked or un-smoked marijuana. Finally, the defense noted that Defendant's bumper sticker and hair style associated him with Rastifarians who are identified with marijuana usage; it was argued that the rangers in effect searched Defendant's car not based upon probable cause to believe it contained contraband, but because they had improperly "profiled" him as a marijuana smoker.

**C.    Applicable Law**

The Fourth Amendment of the Constitution of the United States prohibits unreasonable searches and seizures. Searches conducted pursuant to a warrant issued

on a finding of probable cause generally may be considered reasonable.  Katz v. United States, 389 U.S. 347, 356 (1967).  There are, however, exceptions, excusing the need for a warrant prior to conducting a search.  One exception allows a vehicle to be searched without a warrant if there exists probable cause sufficient to justify issuance of a warrant.  United States v. Ross, 456 U.S. 798 (1982).  This vehicular exception to the warrant requirement exists because vehicles are mobile and can be quickly driven beyond the jurisdiction in which a warrant is sought and because there is a lesser expectation of privacy in vehicles traveling in the open public than in, say, a private home.  California v. Carney, 471 U.S. 386, 390-90 (1985).

Once it is determined that there is probable cause to believe a vehicle contains contraband, a warrantless search of every part of that vehicle, and such contents as might conceal the object of the search, is justified.  Ross, 456 U.S. at 825; Wyoming v. Houghton, 526 U.S. 295, 301 (1999).  The odor of marijuana emanating from a vehicle creates sufficient probable cause to justify a warrantless search of the vehicle.  Maryland v. Dyson, 527 U.S. 465, 467 (1999); United States v Ojeda-Rodriquez, 502 F.2d 560, 561 (9th Cir, 1974), cert. denied, 420 U.S. 910 (1975); United States v. Barron, 472 F.2d 1215, 1217 (9th Cir. 1973); United States v. Chelgren, No. CR-S-10-182 KJM, 2010 WL 3210839 (E.D. Cal. Aug. 10, 2010).

Although the warrantless search in Chelgren ensued from a traffic stop, it was not the traffic violation which gave the officer probable cause to search the vehicle, but rather the smell of marijuana detected after the stop .  Chelgren, 2010 WL 3210839, at *7-12.  "[T]he fact that an agent familiar with the odor of marijuana smelled such an odor emanating from the automobile . . . alone was sufficient to constitute probable cause for a subsequent search for marijuana."  Barron, 472 F. 2d at 1217

**D.    Evaluation of the Evidence**

There is no dispute but that the rangers had reasonable suspicion based upon the apparent parking violation and the expired registration tag to briefly detain and question Defendant.  Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (a police officer who detains

an individual during a traffic stop with reasonable suspicion may ask the detainee a moderate number of questions to determine the individual's identity and to obtain additional information regarding the police officer's suspicions). In the abstract, questions could arise in this case as to how long that questioning properly could have continued without probable cause for search and/or arrest and without advisement of Miranda rights. However, as the defense effectively acknowledges, the aroma of marijuana coming from the interior of the automobile in and of itself can, and according to the government, did justify a full search of Defendants's vehicle and use of contraband found in that search as evidence in the prosecution of Defendant.

In this case the alleged detection of the marijuana odor occurred before any event which plausibly could be claimed to be any thing other than a brief investigatory inquiry of apparent parking and registration violations: While Ranger Pope was writing a parking citation, Defendant approached, identified himself as the owner of the truck, said he had left the vehicle there only temporarily to inquire about camping, and proposed to move the vehicle. Ranger Pope requested and was given Defendant's motor vehicle identification. Ranger Pope then noticed the expired registration sticker and confirmed it had expired.

Defendant advised he had registration documentation in the vehicle. Ranger Jacobs asked to see it. Defendant offered to retrieve it, but reportedly signaled a preference to do so unaccompanied by any rangers. He went to the driver's door. Ranger Jacobs followed directly behind him. According to Ranger Jacobs, when the door was opened, he immediately smelled the distinct and very strong odor of green marijuana emanating from the passenger compartment. That sequence of events, if proven, would not have triggered any law enforcement obligation to Mirandize the Defendant.

According to law enforcement it was that sequence, and in particular, the reported detection of marijuana odor in the course thereof, that lead to the decision to search the vehicle for evidence of suspected contraband marijuana. (Possession of marijuana in the National Park being a Class B misdemeanor. 36 C.F.R. § 435 (b)(2).) As noted, the aroma of marijuana coming from the interior of a vehicle justified the warrantless search

-8-

of every part of it and such of its contents as might conceal the presence of marijuana. There is no contention that a such a search would not have turned up the weapon found in the holster in the map pocket on the back of the driver's seat.

It is noted that just before the search began Defendant made a statement about personal use of marijuana which, though equivocal as reported, could be considered incriminating and then, once the search began, acknowledged the presence of the weapon in the vehicle.

The Court finds that the continued inquiry of Defendant, at least to the point where he acknowledged the presence of the weapon, was not a custodial interrogation requiring advisement of Miranda rights. Mere questioning of an individual is not a seizure of that individual or a restraint on his freedom such as to amount to a formal arrest or its equivalent where, as here, applying the criteria in <u>United States v. Kim</u>, 292 F.3d 969, 973-78 (9th Cir. 2002): although Defendant had been confronted with guilt as regards possession of marijuana, nothing in the language used or the physical surroundings suggested he was in custody; the detention to that point had been brief (the entire event from start to completion of search was estimated to have lasted about ten minutes); and no pressure was applied to detain Defendant (he was asked to sit on the rear bumper and he complied). <u>See also</u>, <u>Florida v. Royer</u>, 460 U.S. 491, 497-502 (1983); <u>Stansbury v. California</u>, 511 U.S. 318, 322-24 (1994); <u>United States v. Washington</u>, 490 F. 3d 765, 770 (9th Cir. 2007). Reportedly, the search ensued, as it lawfully could, based solely on the marijuana odor, and such a lawful search extended to everything within the vehicle that might conceal marijuana, including the map packet where the pistol was found. It was found after Defendant acknowledged its presence, but, as noted, that acknowledgment came before Defendant was in custody, and the pistol could and surely would have been found during the lawful search for marijuana.

So, coming full circle, the Court addresses that which all agree is the crucial issue in this regard: Did Ranger Jacobs actually have probable cause to believe there was marijuana in the car? The evidence, though troubling in some respects, satisfies the Court

that he did and did so independently of any statements by Defendant.  Had Ranger Jacobs come to the Court at the time and sworn, as he did at trial, as to his qualifications and experience and that he smelled marijuana in the vehicle, that, without more, would have constituted probable cause to issue a warrant to search the vehicle.

Ranger Jacobs testified at the suppression hearing that he had been a Park Service Law Enforcement Officer for about ten years, had attended two law enforcement academies, had been trained in the detection of marijuana, and had been exposed to its odor on hundreds of occasions.  He testified under penalty of perjury that immediately upon Defendant opening the truck door he detected what he knew from his training and experience to be the odor of marijuana.  He also testified under oath that Defendant attempted to discourage the ranger from accompanying Defendant to retrieve the registration confirmation and that Defendant commenced "rummaging" around in the area of the center console before going to the glove box where the registration was reported to be.  As noted the odor alone would have justified the ensuing search, but the other factors would add to the totality of circumstances justifying a warrantless search.

Defendant argues that Ranger Jacobs could not reasonably have smelled marijuana because there were other odors in the air including the aroma of "one or two" recently smoked, flavored cigars.  Defendant did not respond to Ranger Jacob's inquiry about marijuana by advising that the aroma was in  fact the aroma of smoked cigars.  Not having thus been given reason to doubt his olfactory abilities, and considering Defendant's other actions, there was no reason for Ranger Jacobs to question his extensive training and experience or doubt that he did in fact smell marijuana.

The fact that the marijuana was found in the vehicle certainly is consistent with testimony that it could be smelled.  The fact that it was located in what was described as a closed glass jar sitting in an open plastic shopping bag does raise questions as to how its aroma escaped.  However, we do not know whether or how recently prior to the search the jar had been opened and the contents used.  The fact that Defendant was observed doing something described as "rummaging" in that area just before the search suggests

one possibility. We do know that a trained and licensed law enforcement officer testified under oath that he did smell it.

Further, albeit not entirely consistent, corroboration of Ranger Jacob's testimony is found in the sworn testimony of Rangers Pope and Bicknese that they both smelled marijuana in the vehicle. Both are trained in detecting the aroma of marijuana. Ranger Pope had been a trained law enforcement ranger for about three years and been exposed to the odor of marijuana approximately 100 times. Ranger Bicknese had been in law enforcement for about 2 years, had received training as such and been exposed to the smell of marijuana 15 to 20 times. Granted, Ranger Pope did not smell it until after the glass jar had been found, but it appears he did not approach the cab of the vehicle until after it was found. Of more concern, Ranger Bicknese testified that he smelled smoked marijuana which, the evidence suggests, has a distinctly different aroma than the fresh unsmoked marijuana that Ranger Jacobs smelled. We can only speculate as to the reason for the conflict–it could, for example, reflect dishonesty on the part of the ranger(s), poor recollection on the part of one of the rangers, differences in training, or a newer officer mistaking the smell of smoked tobacco for that of smoked marijuana.

The Court finds that the weight of the evidence–the fact that marijuana was indeed present, the fact that three trained officers testified under oath that they smelled it, the lack of Defendant's attribution of the odor to tobacco[2]--supports Ranger Jacob's sworn testimony that he did in good faith believe he smelled marijuana. The Court finds that testimony credible. The Court also finds that that good faith belief reasonably provided probable cause to search the vehicle.[3]

/////

/////

---

[2] The Court does not suggest that any of these factors other than Jacob's smelling marijuana and perhaps Defendant's pre-search actions gave probable cause for the search. They are noted here only to the extent they tend to corroborate Ranger Jacob's testimony that he did smell marijuana.

[3] The Court sees no reason to reject the officers' testimony that they were trained that "profiling" is "absolutely illegal" and they focused their investigation, not on any profile, but on suspicious activity.

## E.    Conclusion re Motion to Suppress

Ranger Jacob's honest belief[4] that marijuana was present was reasonable under the circumstances and justified the search.  The contraband produced therefrom was the result of a lawful search, not the fruit of any poisonous tree.  The motion to suppress was properly denied.

## V.    MOTION TO DISMISS

### A.    Issue

As noted, prior to trial of this case, Defendant filed a motion to dismiss Count 1 of the First Amended Complaint charging him with possession of a concealed weapon in violation of 35 C.F.R. § 2.4(f).  (He also challenged, on constitutional grounds, Count 2 alleging possession of a controlled substance, but Count 2 was then dismissed by the government.  Thus, the Court does not address the constitutional challenge to Count 2.)

Defendant claims 35 C.F.R. § 2.4(f) violates the Second Amendment of the United States Constitution. That regulation makes it a misdemeanor to carry in violation of state law.  California Penal Code section 25400(a) (formerly, section 12025(a)(1)) prohibits the carrying of a concealed weapon in the manner described therein.  Defendant argues that the statute violates the rights guaranteed under the Second Amendment of the Constitution of the United States as interpreted by <u>District of Columbia v. Heller</u>, 544 U.S. 570, 595 (2008).

### B.    Governing Law

36 C.F.R. § 2.4 (f) provides in pertinent part as follows: "The carrying or possessing of a weapon . . . in violation of applicable Federal and State laws is prohibited."

California Penal Code section 25400(a), as relevant here, provides: "A person is guilty of carrying a concealed firearm when the person does any of the following:

(1) Carries concealed within any vehicle that is under the person's control or direction

---

[4] A good faith reasonable belief is sufficient even if mistaken.  See Brinegar v. United States, 338 U.S. 160, 176 (1949) (law enforcement officers should be given some room for mistake in making probable cause determinations).

1  any pistol, revolver, or other firearm capable of being concealed upon the person."

2      California Penal Code section 25550 (formerly, section 12026.2) creates an
3  exception for one going to or coming from a lawful camping activity if the weapon is
4  transported in a locked container.

5      The Second Amendment to the United States Constitution reads: "A well-regulated
6  Militia being necessary to the security of a free State, the right of the people to keep and
7  bear Arms shall not be infringed."

8      The Supreme Court in District of Columbia v. Heller, 544 U.S. 570, 595 (2008) found
9  unconstitutional a District of Columbia law which essentially prohibited any District of
10 Columbia resident from possessing a hand gun in his home. The Supreme Court found
11 the regulation inconsistent with the core right guaranteed by the Second Amendment. Id.
12 at 635.        The Heller Court did not address the statute at issue here or the
13 constitutionality of such concealed weapons laws generally. It also did not set forth a clear
14 standard of review to be used in evaluating gun laws in light of Second Amendment
15 protections.

16      In Nordyke v. King, 644 F.3d 766, 786 (9th Cir. 2011), a three judge panel of the
17 Ninth Circuit Court of Appeals created a test for determining the standard of review to be
18 applied in Second Amendment cases. It initially held that the "heightened scrutiny"
19 standard of review only applied to regulations that "substantially burden" the right to keep
20 and bear arms. Id. at 786. Hence laws which did not substantially burden that right need
21 have only a rational basis. Id. at 785-786.

22      However, in a later en banc review of the same case in Nordkye v. King, 681 F.3d
23 1041, 1044 (9th Cir. 2012), the Ninth Circuit used a general "rule of thumb" which did not
24 direct the standard of review to be used in ensuing cases.

25      During the interim period between the two Nordkye cases, i.e., prior to the Ninth
26 Circuit en banc decision distancing itself from the "substantial burden test," a lower court
27 applied that test and upheld a gun licensing regulation. In Richards v. County of Yolo, 821

28

F.Supp.2d 1169 (E.D. Cal. 2011) a party denied a handgun permit by Yolo County challenged the county's interpretation of its authority to license concealed weapons. The District Court determined that since the license policy left individuals with other options for protection, it did not substantially burden the Second Amendment right to bear arms and, therefor, that rational basis review was sufficient. It found the county regulation to have a rational basis and upheld it.

One other federal court in California also upheld the constitutionality of county concealed weapons policies even though finding the regulation required a higher level of scrutiny. In Puerta v. County of San Diego, 758 F.Supp. 2d 1106, 1114-15 (S.D. Cal. 2010), decided before either Nordyke decision, plaintiffs were challenging both the county policy and the predecessor California concealed weapons statute (California Penal Code section 12050), The court applied intermediate scrutiny. It found strict scrutiny inapplicable because the regulation did not go to the "core" Second Amendment right of possession of firearms in the home.

C.    **Competing Arguments**

Both the government and the defendant acknowledge the limited law in this area; both rely on the same cases, but each asks the Court to draw a different conclusion or string of conclusions as to how case law is it is to be applied in this case.

Defendant does not take a position on which standard of review should be applied. He simply argues that the law on its face imposes an impermissible, unconstitutional burden on the right to bear arms. He also argues (without basis in any evidence before the Court) that it is conceivable that he moved the pistol from the unsecured bed of his pickup (where it arguably would not have been "under his control" within the meaning of the statute and hence not violative of the statute), into the more secure locked cab of his pickup while he was away from the vehicle. Defendant argues that if such safety-motivated conduct can be criminalized, then the criminalizing statute can not be justified under any standard of review.

The government argues that this Court should apply the rational basis standard adopted by the district court in <u>Richards v. County of Yolo</u>, 821 F.Supp.2d 1169, 1174 (E.D. Cal. 2011), but also argues that the statute poses such a minimal intrusion on the right to bear arms that it would pass scrutiny even under an intermediary level of review. The government notes that the statute does not prohibit the possession or transportation of a handgun while one is in or driving a vehicle or in the National Park. It simply compels the possessor to keep the weapon in a locked box secured from third parties. The government argues that such a minimal intrusion is not unconstitutional under either standard of review.

### D.  <u>Analysis</u>

Without reaching and deciding the standard of review issue, this Court agrees with the government. It finds that under even a raised level of scrutiny California's concealed weapon law is constitutional.

As noted, <u>Nordyke</u> leaves it unclear what standard of scrutiny the Ninth Circuit will apply to such Second Amendment challenges. On initial review, a three-judge panel adopted the "substantial burden test", i.e., regulations that substantially burden the right to keep and bear arms are to "receive heightened scrutiny." <u>Nordyke v. King</u>, 644 F.3d 776, 786 (9th Cir. 2011). The three judge panel then found that a ban on gun shows at county fairgrounds did not substantially burden the right to keep and bear arms and therefor that the law did not have to withstand heightened scrutiny. <u>Id.</u> at 788. On en banc review of the case, the full panel of the Ninth Circuit simply found that the county's (new) interpretation of the ordinance was reasonable and did not violate the Second Amendment. <u>Nordkye v. King</u>, 681 F.3d 1041, 1044 (9th Cir. 2012). The court did not explicitly state what  standard of review was being applied or whether it adopted the "substantial burden test." <u>Id.</u>

Notwithstanding uncertainty as to what standard of review to apply,  the Court finds that regardless of whether the statute is analyzed under intermediate scrutiny or rational

basis criteria, it passes constitutional muster.

1.  Intermediate Scrutiny

In a very similar case, the Fourth Circuit, applying intermediate scrutiny, found that a statute that prevented an individual from carrying a loaded handgun in a vehicle in a national park was constitutional. United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011). The court there found that Heller required more than rational basis review but that strict scrutiny was not required for the challenged regulation because doing so would "foreclose an extraordinary number of regulatory measures." Id. at 471. The court concluded that the government had "a substantial interest in providing for the safety of individuals" who visit national parks and that the regulation was reasonably adapted to that interest. Id. at 473-474. The statute was upheld as constitutional under the Second Amendment. The holding in Puenta, discussed above, is consistent.

The same analysis here leads to the same conclusion. As in Masciandaro, the government has a substantial interest in providing for the safety of individuals who visit Yosemite National Park. The regulation is reasonably adapted to that goal. Carrying in a concealed manner an accessible gun (even unloaded, but with a loaded magazine accessible) has the potential to endanger visitors and workers in Yosemite National Park. The law is reasonably designed to protect against that risk without foreclosing a citizen's right to have in his possession a weapon and ammunition, even when both are concealed. The statute is related to a substantial state interest. It does not impose a substantial burden on the right to bear arms. It withstands intermediate level scrutiny. It is constitutional under the Second Amendment.

2.  Rational Basis

If the statue passes intermediate review, it clearly passes the lesser, rational basis, review criteria. In fact, absent further direction from the appellate bench, this Court believes Richards v. County of Yolo, 821 F.Supp.2d 1169 (E.D. Cal. 2011) should govern the outcome in this case. There it was held that a county's concealed weapon licensing

policy was constitutional because, applying the initial Nordyke test, it did not impose a substantial burden and it was rationally related to the county's goals.

A regulation is constitutional under rational basis review if it bears "a reasonable relationship to a legitimate government interest." Richards v. County of Yolo, 821 F.Supp.2d 1169, 1175 (E.D. Cal. 2011). In Richards, the court found the county had a legitimate government interest in protecting the public safety and that regulating concealed firearms was an essential part of protecting public safety. Id. The county's policy was rationally related to this legitimate goal and was upheld.

The regulation at issue here deals with the same threat to public order and potential for public harm as in Richards, and the law is reasonably related to a legitimate governmental interest. The regulation is constitutional under the Second Amendment.

### E.      Conclusion re Motion to Dismiss

For the reasons set forth above, the Court finds that the statue underlying Count 2 of the First Amended Complaint is not facially inconsistent with the Second Amendment and is not  unconstitutional.  The motion to dismiss the said Count 2 is denied.

## VI.      MOTION FOR JUDGEMENT OF ACQUITTAL

### A.      Introduction

As noted, after the United States presented its evidence on the four counts in the First Amended Complaint,   Defendant moved for judgment of acquittal on all four counts in accordance with Rule 29 of the Federal Rules of Criminal Procedure.  Post trial briefing was submitted in support of and in opposition to Defendant's said motion.  The matter was deemed submitted and is addressed here.

### B.      Standard of Review

Fed. R. Crim. P. 29(a) provides, as pertinent here, that a defendant may move for judgement of acquittal after the government closes its evidence. The rule provides  that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 324 (1979); United States v. Nevils, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). Further, "all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury's verdict."  United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

**C.    Analysis**

1.    Count 1, Possession of a Concealed Weapon

Defendant maintains that the evidence presented to date is insufficient to establish that he "carried" a concealed weapon in violation of California law.

Chapter 36, Section 2.4(f) of the Code of Federal Regulations makes it a misdemeanor to carry or possess a weapon in a national park in violation of state law. Defendant is charged with violating that regulation by coming within the proscription of California Penal Code section 12025 (a)(1) (now California Penal Code section 25400(a)) which prohibits one from carrying "concealed within any vehicle under his control or direction any pistol . . . capable of being concealed upon the person."

California Penal Code section § 12025(f) excludes from the definition of "concealed" the carrying of a firearm "openly in belt holsters."   California Penal Code section 12026.2(a)(11) further exempts "transportation of a firearm by a person when going to, or coming directly from, a lawful camping activity for the purpose of having that firearm available for lawful personal protection while at the lawful campsite" provided, according to California Penal Code section 12026.2(b), the weapon is transported in a locked container.

We apply these statutes to the existing evidence of this case.  As thus far adduced by the government, the relevant facts are the following:

a.    While in Yosemite National Park, Defendant had in his possession, i.e.,

subject to his ownership and control, a weapon.

b. There is no evidence to suggest that Defendant had the weapon with him for any reason other than for his lawful protection while camping.

c. At the time the weapon was found, Defendant had temporarily interrupted his course of travel from one campground to another.

d. The weapon, a pistol, was capable of being concealed.

e. The weapon, when discovered by law enforcement, was hidden from view in a map pocket on the back side of the driver's seat of a vehicle which was then stopped, but which had been driven to that point by Defendant and which remained under the control of Defendant. The map pocket was hidden from view by assorted camping-related gear.

f. The weapon was in a holster; it was not in a locked container within the vehicle.

g. There is only circumstantial evidence as to where the weapon had been located during its transport to the spot where the vehicle was parked.

Defendant argues that these facts leave the government short of having carried its burden of proving that Defendant violated any of the California statutes cited above. More specifically, he claims that the evidence does not show that the weapon was carried concealed "within the vehicle." He argues that there is a "fair inference" that the weapon had in fact been carried visibly in its holster on Defendant's hip or located in the exterior bed of the truck, perhaps even visibly so, while the vehicle was in route and then placed inside the vehicle only after Defendant parked it.

Defendant misinterprets the standard for evaluating a motion for acquittal; as noted, all reasonable inferences are to be drawn in favor of the government at this stage of the proceeding. Thus, even if it were reasonable to infer as Defendant requests, doing so would not justify granting his motion. Moreover, as discussed below, the Court, without ruling out the possibility that the gun may have been transported in plain view, certainly

views it as the less likely possibility, with the weight of reason, logic and circumstantial evidence pointing to the contrary.

Conceivably, one might travel with a holstered weapon sitting openly in the back of his pickup or in a holster attached to his hip, and then, on parking his vehicle, remove the weapon from one of those two places and secrete it in a map pocket behind an interior seat buried under camping gear. However, such actions seem quite unlikely. Why would one who felt comfortable driving into a national park with a handgun strapped to his hip have any trepidation about leaving the vehicle with the same gun still strapped to his hip? Similarly, one wise enough to ensure his handgun is locked away hidden inside his vehicle when he leaves the vehicle does not seem likely to have been a person who would have been willing to leave it exposed in the bed of his truck while driving. And if the handgun were hidden under objects in the bed of the truck, why would he want to risk drawing attention to it by moving it to the cab of the truck?

None of these possibilities is beyond the pale, but the reasonable inference from the circumstances is that the weapon was in the map pocket when Defendant entered Yosemite Valley and it remained there, untouched, when Defendant left his truck to inquire about camping.

Aside from illogic, the government points to rather compelling circumstantial evidence that the weapon had been in the map pocket for some time. When first asked at the scene if he had any weapons, Defendant replied that he did not and then, on being asked again, seemed to recall that he might in fact have the pistol in the map pocket. If Defendant had, as he wants us to infer, just moments earlier gone to some thought and effort to move the weapon from the bed of the truck, or from his hip, to the a hiding place within the cab of the truck, it is unlikely that he would have forgotten he had the weapon with him.[5]

_____

[5] It is of course possible that Defendant did remember that he had the weapon but consciously undertook to falsely respond to law enforcement questions. That scenario suggests other problems for Defendant.

For these reasons, the Court does not find the government's evidence so scant that a rational fact finder could conclude that the government had not proved the charged crime beyond a reasonable doubt. That, in and of itself, precludes granting the motion to acquit on this count.

Thus, while the Court is unpersuaded from the scant law provided that driving with a pistol in a holster on the hip or in the bed of a pickup truck forecloses the "carrying" element of "carrying of a concealed weapon" as Defendant seems to argue, it need not reach that issue here.[6] Viewing the evidence presented to date, no reasonable juror would have reasonable doubt about Defendant's guilt as to Count 1.

The motion for acquittal on Count 1 is denied.

2.    Count 2, Driving on a Suspended License

Defendant also was charged, in Count 2, with driving when his driving privilege had been suspended and with knowledge that it had been suspended, in violation of California Vehicle Code section 14601.1(a).

Defendant does not dispute that he was driving or that his license was suspended at the time charged. However, he maintains that the government has not shown he had knowledge of the suspension.

Defendant does acknowledge that government's Exhibit 1, admitted into evidence without objection, is evidence that on July 20, 2011, prior to the date of Defendant's citation in this case, Defendant was verbally notified that his license had been suspended on March 16, 2011, and the it appears that Defendant himself acknowledged being given such notice.

---

[6] Defendant does not dispute the indisputable conclusion that the weapon entered the Park with Defendant and his vehicle. Instead Defendant seems to argue that it was not being "carried" illegally because it may have been on his hip, or because it may have been carried openly in the back of the truck, or, even if concealed in the back of the truck, it did not need to be in a lockbox because it was not being carried "in" the vehicle. If Defendant presents evidence consistent with either scenario, he will need to present a more cogent supporting argument and provide supportive authority beyond a dictionary. From the meager authority cited, the principle stated in People v. Smith, 164 P.2d 857 (1946), seems most reasonable; it provides that to "carry concealed" means to have the weapon in a vehicle in such a way that locomotion of the vehicle would carry the weapon with it.

Such notice is sufficient.  California Vehicle Code section 13106 requires notice of suspension be given by first class mail "except for those persons personally given notice."

The evidence satisfies the Court that Defendant received actual, verbal, first person notice of his suspension and was driving a vehicle at a time when he had actual notice of that suspension.

The motion for acquittal on Count 2 is denied.

### 3.  Count 3, Driving with an Expired Registration

There is no dispute but that the registration on Defendant's vehicle was expired at the time of his arrest.  However, there is no evidence before the Court at this time that Defendant had actual knowledge of the expiration.  Defendant argues that his statement to the rangers at the scene evidence his lack of knowledge that the registration had expired.  He then argues that since the statute is silent as to whether knowledge, and thus intent to violate the law, is required for its violation, a knowledge element should be read into it.  Defendant cites to Staples v. United States, 511 U.S. 600, 618-19 (1944), for the proposition that when a statue has no explicit "knowing" element, the government must prove defendant knew the facts that made his conduct illegal.  He argues that silence as to mens rea means the offense a general intent crime.  As such the government must prove defendant intended to do the prohibited act; mere inadvertence, negligence is insufficient to show general intent (citing to People v. Atkins, 25 Cal. 4th 76, 82 (2001); People v Linwood, 105 Cal. App. 59, 71 (2003)).

When one registers a vehicle, he is told it is for a specified period of time and then must be renewed.  The individual thus has been given actual notice of the expiration date. When that date passes without his having renewed the registration, he necessarily knows - or at least has been put on notice – that the registration has expired.

The evidence presented to date is sufficient to establish beyond a reasonable doubt that Defendant violated the regulation as charged.

Defendant's motion for acquittal on Count 3, is denied.

### 4. Count 4, Stopping or Parking on a Park Road

The regulation, 36 C.F.R. § 4.13, as pertinent here, prohibits "Stopping or parking a vehicle upon a park road . . . ." 36 C.F.R. § 1.4 defines a park road as the "main-traveled surface of a roadway open to motor vehicles, owned, controlled or otherwise administered by the National Park Service."

The evidence presented to date satisfies the Court that the location at which Defendant was stopped was an area within and controlled by the National Park Service, used for vehicles to circumnavigate a central area designated for parking vehicles, and generally used by the public to circle that parking area looking for available parking spaces. The Court is further satisfied from the government's evidence that the area meant and used for circling consisted of two lanes and that Defendant's vehicle was parked in, and blocking, one of those two lanes. In plain English, Defendant's vehicle was obstructing one lane of a two lane road used by vehicles as the main-traveled surface to search for and access parking spaces in a parking lot.

Defendant argues that this lane within the parking lot was not a "road" within the meaning of 36 C.F.R. §§ 4.13 and 1.4.

Neither party has located any authority enlightening on this issue. Neither has the Court. We are dependent upon common sense and common usage.

It certainly meets the classic definition of a "road", i.e.,

" . . .a road or way established and adopted . . . by the proper authorities for the use of the general public, and over which every person has a right to pass and to use it for all purposes of travel or transportation to which it is adapted and devoted." Blacks Law Dictionary,1328 (Sixth ed., 1990) (the last edition of Blacks to provide a definition of "road").

From the Court's perspective, every portion of that definition applies to the passage at issue here. The Court concludes that it was and is a "road" within the meaning of the applicable regulations. The evidence presented to date is sufficient to establish beyond

a reasonable doubt that Defendant violated the regulation as charged.

Defendant's motion for acquittal on Count 4, is denied.

### D. Motion Denied

For the reasons set forth above, Defendant's motion for judgment of acquittal pursuant to Fed. R. of Crim. P. 29 is denied in its entirety.

## VII. CONCLUSION

For all the reasons set forth above, the denial of Defendant's motion to dismiss and motion to suppress stand as the decisions of this Court, and Defendant's motion for acquittal pursuant to Fed. R. Crim. P. 29 is denied on all counts. Defendant shall, within ten days of the date of this Order, advise if he wishes to proceed and present additional evidence in his own behalf at the continued trial now scheduled to begin at 1:30 p.m., Wednesday, February 13, 2013.

IT IS SO ORDERED.

Dated: ___January 18, 2013___        ___/s/ *Michael J. Seng*___
                                     UNITED STATES MAGISTRATE JUDGE